**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FARMLAND INDUSTRIES, INC., et al., | ) | Case No. 02-50557-JWV |
| | ) | |
| Debtors. | ) | Joint Administration |
| | ) | |
| PJ SERVICES, LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 04-4056-JWV |
| | ) | |
| FARMLAND INDUSTRIES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

PJ Services, LLC ("PJ Services") filed a complaint and a proof of claim (No. 9206) against Farmland Industries, Inc. ("Debtor") seeking $4,501,330 in damages based on the Debtor's alleged breach of an oral contract whereby PJ Services was to provide South African workers for the Debtor's local agricultural cooperatives. The Debtor contends that PJ Services failed to prove the existence of an oral contract, that any purported contract would be unenforceable under the Statute of Frauds, and that PJ Services failed to prove its entitlement to damages.

A combined trial of these two matters was held on September 8, 2004, in Kansas City, Missouri, at which time the Court took the matters under advisement and ordered post-trial briefing. After considering the arguments of the parties, the evidence presented, and the relevant case law, the Court is prepared to find that an oral agreement existed between the parties and that PJ Services is entitled to a general unsecured claim for $250,000.00 against the Debtor's bankruptcy estate.

**I. BACKGROUND**

Petrus Jacubous Botes ("Botes") and Joyce Yvonne Coetzee ("Coetzee"), are citizens of South Africa who came to the United States in 2000 to promote a safari business, African Pride. In the fall

of 2000, they were approached by another South African, Bertie Cloete, who informed Botes and Coetzee that he believed that the Debtor might be looking to hire South Africans to perform agricultural work, and he requested that Botes and Coetzee approach the Debtor about finding work for him. In fact, the Debtor had a placement services department that was seeking qualified agricultural workers to work at various farming cooperatives throughout the United States.

Acting as Bertie Cloete's agents, Botes and Coetzee traveled to the Debtor's headquarters in Kansas City, Missouri, where they met with the manager of the Debtor's placement services, Jim Hunt ("Hunt"). According to Botes and Coetzee, Hunt (now deceased) informed them that the Debtor anticipated needing a large number of agricultural workers – between 600 and 700 – for the year 2001 alone. As explained to the Court by Stephen Rice ("Rice"), a recruiter for the Debtor's placement services and a subordinate of Hunt, the Debtor was not the primary employer of the agricultural workers; rather, the Debtor only screened the applicants and put their information into a central database and then referred qualified workers to local cooperatives. The local cooperatives would then interview – and hire – any prospective employees they wished. The jobs paid $20,000.00 to $30,000.00 a year. The Debtor charged the local cooperatives 20% of a new employee's first year base pay for its placement services.

Botes and Coetzee testified that they eventually reached an agreement with Hunt whereby they would provide between 600 and 700 applicant resumes of South African workers in 2001 who would be willing to move to the United States and work for three years at the cooperatives. In return for Botes's and Coetzee's recruitment efforts, the Debtor purportedly agreed to pay PJ Services,[1] an entity formed by Botes and Coetzee, $1,000.00 for each successful applicant.[2] PJ Services was to find the

---

[1] The members of PJ Services, LLC were Botes, Coetzee, and African Pride. Botes stated that he and Coetzee were never employees of PJ Services.

[2] In stark contrast to Botes's testimony, Stephen Rice stated that it was not the Debtor's practice to pay another placement service like PJ Services; rather, any arrangement with PJ Services was only one of "interaction and cooperation" inasmuch as Rice believed that PJ Services was being paid by the individual candidates for its services. In fact, PJ Services was exacting about $1,150.00 from each applicant after the Debtor had approved the applicant's resume. Rice testified, however, that he was not a manager in the placement department and that he did not have any knowledge of the Debtor's payment arrangements. Rice also testified that his supervisor, Hunt, would have the authority to make a decision to pay another placement service.

applicants, screen them, and assist the South African workers in obtaining the necessary documentation to come to the United States. The Debtor undertook the obligation to obtain the necessary documentation that would allow it to hire the South Africans. Botes also testified that PJ Services was entitled to payment for each applicant as soon as the Debtor approved an applicant's resume, and that PJ Services was to provide 250 workers to the Debtor by January 15, 2001.[3] Although Botes testified that his oral agreement with the Debtor was to be completed before the fall of 2001, he also stated that if any worker failed to complete a three-year work term, then PJ Services would find a replacement worker at no extra charge to the Debtor.

Pursuant to their understanding of the deal that PJ Services had struck with the Debtor, Botes and Coetzee stopped soliciting clients for their safari business and focused on recruiting workers for the Debtor. The Debtor provided PJ Services with job descriptions, which PJ Services forwarded to the South African employment agencies with which they were working, Nienaber Consultants and Euro Personnel. PJ Services also advertised the jobs in South African newspapers and by word of mouth. In December 2000, Botes and Coetzee traveled to South Africa to meet with some of the prospective applicants and to ensure that PJ Services would have about 270-300 qualified candidates to present to the Debtor by the January 15, 2001 deadline. PJ Services double-checked to ensure that each applicant had a detailed resume, a clean criminal record, a medical clearance to work, and no drug dependency. Of the 270-300 resumes PJ Services delivered to the Debtor, Botes testified that the Debtor only rejected two of the applicants and that Hunt asked for some supplemental information after reviewing a few of the resumes; otherwise, the Debtor accepted all the resumes presented to it.

Once the Debtor approved an applicant's resume, PJ Services exacted about $1,150.00 from each applicant as a fee, and the applicants prepared to move from South Africa to the United States. Botes stated that PJ Services was owed $1,000.00 from the Debtor once the resumes were approved, but Botes testified that Hunt requested that PJ Services forbear receiving payment until the Debtor

---

[3] Gert Marias, a South African pilot recruited by PJ Services as a potential candidate for the Debtor, testified that he understood from a meeting with Hunt in March 2001 that the Debtor had about 250 labor certificates for the South African workers and that the Debtor was ready for PJ Services to start bringing those workers to the United States. Marias, who refused a potential job as a ground rigger, stayed with Botes and Coetzee, helped in PJ Services's office, and would sometimes drive South African workers to interviews with Rice and Hunt.

finished the legal documentation to allow the South African candidates to work in the United States. PJ Services agreed; thus, PJ Services never sent an invoice to the Debtor for payment. According to Botes, PJ Services was not worried about being paid because the Debtor was a multi-billion dollar company.

Meanwhile, the Debtor employed Jeffery Stuart Bell ("Bell"), an immigration attorney in Kansas City, Missouri, to work on obtaining the necessary permits and visas to allow the Debtor to hire the South African aliens. On October 18, 2000, Bell wrote to the United States Department of Labor seeking guidance on whether the Debtor could submit a master application for employment certification listing the Debtor as the sole employer – with the understanding that its H-2A application[4] would be covering its member cooperatives located in several different states. Bell represented that as the employer, the Debtor would be responsible for the H-2A requirements such as wages, housing, and transportation. In total, Bell filed 223 H-2A applications and 223 H-2B applications on behalf of "unnamed" aliens. Those applications were all signed by Hunt. In fact, numerous H-2B visas were issued to South African workers in May 2001, all of which listed the Debtor as the individual's employer.

Unfortunately, the Debtor was not able to obtain all of the necessary documentation in each prospective state of employment to allow the South African applicants to work in the United States, and the Debtor was not prepared to place any South Africans by its initial target date of January 15, 2001. On March 12, 2001, Hunt advised Botes that the Debtor's immigration attorney continued to timely file everything on behalf of the South African workers, but that the Debtor was experiencing delays with the various state labor departments. Hunt anticipated that some of the necessary paperwork would be approved by April 1, 2001, and he counseled that the South African workers should be patient. Botes then relayed that information to South Africa where many of the applicants were greatly upset because they believed that the Debtor had promised jobs to them beginning in January 2001, but still had not delivered. By April, however, about 10-12 South Africans came to the United States, were interviewed by the Debtor, and found jobs at local cooperatives. On April 23, 2001, Hunt wrote Botes that the Debtor was still diligently working on obtaining the necessary state

---

[4] Bell stated that an H-2A or an H-2B application was used by a domestic employer who wanted to hire foreign workers.

-4-

permits. Hunt also related that the Debtor felt confident that the jobs would still be available, and that the Debtor wanted to work with Botes and his South African candidates. To this end, Hunt issued at least eighteen letters to specific individuals stating that the Debtor was working with PJ Services in recruiting South Africans to work for its local cooperatives and that the Debtor believed that "it will be a better working situation if the families are allowed to come over with the various workers." On May 8, 2001, Hunt issued an open letter requesting that Botes act as an agent for some of the South African workers, and requested that Botes facilitate the work permits, immigration papers, and other documentation to "insure an efficient flow of information." On May 21, 2001, Hunt wrote to Botes that it currently had 194 "open slots" to fill. In June 2001, about 35 more South Africans came to the United States and were interviewed by the Debtor but not placed. PJ Services housed those individuals at a motel in Salina, Kansas, incurring expenses of $1,330.00.

On June 14, 2001, the United States Immigration and Naturalization Service ("INS") raided the offices of PJ Services, confiscated all of its files, and instructed Botes and Coetzee not to have any further contact with the Debtor or the South African workers. Botes and Coetzee were both indicted on August 8, 2001 for allegedly engaging in a conspiracy to defraud the United States by assisting the South African workers in entering the United States on visitors' visas and then helping them find employment and for allegedly possessing entry documents (referred to as an I-94) that had been obtained by use of a false statement ; ultimately, they pled guilty to the charge of personally obtaining an I-94 form by use of a false statement and each paid a $1,000.00 fine.

After PJ Services was raided by the INS, and after Botes and Coetzee were charged with federal crimes, the Debtor ceased doing business with PJ Services and terminated both Hunt and Rice for their involvement in recruiting the South African workers.[5] As a result, the approximately 35 South

---

[5] Both Hunt and Rice were terminated by the Debtor in July 2001. Holly McCoy, vice president of the Debtor's human resources department, wrote to Rice that he was terminated because of his involvement with the recruitment of South African workers. McCoy stated:

> In this regard, there are a number of issues which involve both lapses of judgment and misapplication of corporate policy, including but not limited to, your inappropriate execution of a petition to the INS and certain payments to a third party involved in the South African worker issue.

(Pl.'s Ex. 97).

African workers housed in Salina, Kansas, were not employed by the cooperatives, nor were numerous others who had allegedly quit their jobs and sold their belongings in South Africa in anticipation of moving to the United States to work for the Debtor. In fact, on November 20, 2003, Euro Personnel in South Africa sent a demand letter to PJ Services for $3,032,095.92,[6] purportedly representing claims it faced from irate South African workers who felt jilted by Euro Personnel, PJ Services, and the Debtor. Similarly, Nienaber Consultants sent a fax – apparently to PJ Services – purporting to be a claim against the Debtor. Nienaber Consultants claimed costs and damages on behalf of itself and about 100 prospective employees in the amount of $2,706,000. Neither Euro Personnel nor Nienaber Consultants has filed a proof of claim in the Debtor's bankruptcy proceeding.

## II. DISCUSSION

PJ Services asserts that the parties confected an oral agreement whereby PJ Services would supply 600-700 South African workers to the Debtor in 2001 and that PJ Services would receive $1,000.00 for each worker approved by the Debtor. As damages, PJ services seeks $250,000.00 in monies owed to PJ Services for filling the Debtor's order of 250 South African workers by January 15, 2001, another $1,330.00 in reimbursement for expenses it incurred for housing about 35 South African workers in the United States after the Debtor had interviewed those candidates but had failed to place those workers at one of its cooperatives, and $4,250,000.00 in indemnification for PJ Services's expected liability to the employment agencies and individuals in South Africa who believed that they had a job with the Debtor. In opposition, the Debtor argues that PJ Services failed to establish the existence of an oral contract and, if it had, the contract would be unenforceable under the Statute of Frauds. Furthermore, the Debtor argues that PJ Services cannot state a claim for indemnification on the grounds that no contract existed between the parties and that PJ Services has not incurred any liability to third parties.

**A. Existence of an Oral Contract**

The Debtor contends that PJ Services failed to establish the existence of a contract on the basis that the parties never had a "meeting of the minds."

---

[6] The Court is unsure of whether the demand was expressed in terms of South African rands or in United States dollars.

It is axiomatic that to establish the existence of a contract between itself and the Debtor, PJ Services must show the essential elements of a contract, which are "competent parties, proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation." *Edwards v. Martha Rounds Academy for Children*, 845 S.W.2d 658, 661 (Mo. Ct. App. 1992). "The term 'mutuality of agreement' implies a mutuality of assent or a meeting of the minds to the essential terms of a contract." *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo. Ct. App. 2003). The parties must agree on the same thing at the same time. *Cervantes v. Ryan*, 799 S.W.2d 111, 116 (Mo. Ct. App. 1989).

Botes and Coetzee testified that the terms of their agreement with the Debtor in the fall of 2000 were that PJ Services was to supply detailed resumes of 600-700 qualified candidates in 2001 having a clean criminal record, a medical clearance to work, and no drug dependence. Once an applicant's resume was approved by the Debtor, PJ Services would be entitled to a $1,000.00 fee. The Debtor was responsible for ensuring that all the necessary paperwork was filed so that it could hire the South African aliens in the United States. In the event an individual worker was not able to complete a three-year commitment to the Debtor, then PJ Services was obligated to find a replacement worker free of charge at any time during that three- year period. Of the total number of workers needed for 2001, PJ Services was to supply 250 qualified candidates by January 15, 2001. Only after the Debtor experienced delays in complying with state and federal laws did Hunt request that Botes act as an agent for some of the South African workers to help facilitate the work permits, immigration papers, and other documentation to "insure an efficient flow of information."

The Debtor asserts that the testimony of Botes and Coetzee is insufficient to establish a "meeting of the minds" between PJ Services and the Debtor on the basis that their testimony is incredible inasmuch as their testimony is contrary to that of Rice, and inasmuch as Botes and Coetzee gave inconsistent versions of their stories. Additionally, the Debtor argues that PJ Services failed to present any documentary evidence establishing the terms of its purported agreement or that the Debtor owed PJ Services money.

Rice plainly testified that the Debtor never had a contract with PJ Services and that the arrangement was only one of "interaction and cooperation" inasmuch as Rice believed that PJ Services was to be paid by the prospective applicants themselves – not the Debtor. Rice further stated that it was not the Debtor's practice to enter into any agreement with another placement service.

The Debtor also counts five different iterations by Botes and Coetzee regarding the terms of the alleged contract. First, in a June 12, 2002 state court complaint, PJ Services alleged that it had entered into a written agreement with the Debtor to provide the Debtor with 200 South African workers per year for three years. Second, PJ Services's original proof of claim, filed on January 7, 2003, states that it had a written contract with the Debtor for 189 South African workers, which claim was later increased to include 194 and then 204 South African workers who were to be employed for a three-year period. Third, on January 23, 2004, PJ Services amended its proof of claim in this case to assert an oral contract for the employment of 250 South African workers. Fourth, Botes executed an affidavit in 2003 attesting that PJ Services orally agreed to provide the Debtor with 600-700 South African workers to be employed for three years – with PJ Services's contract to be fully performed within one year.[7] Fifth, at trial, Botes reiterated the substance of his affidavit, but also asserted that PJ Services and the Debtor could extend their agreement for additional years if both parties agreed.

As an additional basis to discredit Botes and Coetzee, the Debtor points to Botes's testimony that he and Coetzee allegedly lied in their plea agreement with the INS to resolve the criminal charges against them.

Finally, the Debtor argues that Botes and Coetzee's attempts to establish the terms of the contract cannot be believed on the basis that PJ Services has not offered any documentary evidence indicating that the Debtor owed money to PJ Services for any reason.

While the evidence emphasized by the Debtor is considerable, it is insufficient to defeat PJ Services's claim.

The testimony of Rice – that the Debtor never entered into a contract with PJ Services and that it was not the Debtor's practice to enter into any agreement with another placement service – is enervated by his statements that he was not a manager, that he would not be privy to any payment arrangements made between the Debtor and a third party, and that his deceased supervisor, Hunt, would have the authority to confect a contract with PJ Services. Thus, if Rice is to be believed, he was not in a position to know the details of any agreement between the Debtor and PJ Services.

---

[7] The Debtor also illustrates that the amount of PJ Services's proof of claim changed from $7,250,000 to $4,250,000 to $4,501,330.

Moreover, Rice's testimony was rendered suspect by Rice's pretended lack of knowledge as to why he had been fired by the Debtor, although he had been sent a letter by the Debtor giving the reasons for his termination.

As for PJ Services's different iterations of the terms of the alleged oral contract, the discrepancies are not so profound as to defeat the claim. PJ Services never pursued its state court action due to the Debtor's bankruptcy proceeding, and thus PJ Services never had any reason to amend its complaint. Proofs of claim are frequently amended by the purported creditor to correct information, and the Court notes that Botes's affidavit, PJ Services's January 23, 2004 proof of claim, and Botes's trial testimony are consistent inasmuch as Botes asserted that the overall contract was for 600-700 workers but that PJ Services is only seeking compensation for the 250 workers that the Debtor indicated it would seek to employ on January 15, 2001. The Court also gives considerable weight to the testimony of Marais, who stated that the Debtor's representative, Hunt, admitted in March 2001 that the Debtor "was ready with 250 labor certifications, and ... will notify [Botes] when he could bring the people in."[8]

Regarding PJ Services's failure to demand payment from the Debtor, Botes testified that Hunt requested that PJ Services abstain from receiving payment for a period of time until the Debtor could iron out the necessary documentation to legally hire the South African aliens in the United States. Botes stated that the Debtor was a multi-billion dollar company and that he was not worried about receiving payment from the Debtor. No demand for payment was made after June 14, 2001, on the basis of Botes's and Coetzee's understanding that the INS had forbade them from having any further contact with the Debtor. Before that date, only 10-12 of the South African workers had actually been placed by the Debtor, which amounted to less than 5% of the 250 South Africans the Debtor purportedly promised to employ. PJ Services was essentially a "mom and pop" type of operation,

---

[8] The Debtor also seeks to discredit the testimony of Marais on the basis that evidence of his purported unavailability at trial was never put into evidence, and that his testimony was contradicted by Coetzee who failed to state that Marais was at the meeting where PJ Services and the Debtor allegedly confected an oral agreement. The Debtor's attack on Marais's credibility is unpersuasive. The Debtor never questioned Marais's unavailability at trial, his deposition was taken in Utah, and at his deposition he stated that his home address was in Montana. Marais also testified that he did not meet Hunt until March 2001 – well after PJ Services alleges to have confected its oral agreement with the Debtor.

formed specifically to work with the Debtor, and no evidence exists that it had established any type of regular billing practice. Thus, considering Botes's testimony, the relatively small number of South African workers that the Debtor actually placed at cooperatives, and the nature of PJ Services's business, the Court does not find the absence of an invoice particularly detrimental to PJ Services's claim that it had a contract with the Debtor.

Furthermore, despite the lack of a demand for payment, numerous other documents support PJ Services's assertion that it confected on oral contract with the Debtor. Hunt repeatedly wrote to Botes about the Debtor's efforts to comply with the legal documentation for the South African workers, and Bell applied for 223 H-2A visas and 223 H-2B visas listing the Debtor as the employer for "unnamed" South Africans in addition to securing state work permits for South African workers on behalf of the Debtor.

In sum, the Court finds that PJ Services established by a preponderance of the evidence that it confected an oral contract inasmuch as the parties had a "meeting of the minds" regarding the essential terms of that contract.[9] The documentary evidence convinces the Court of the parties' intimate involvement in the recruitment of South African workers, and demonstrates that the Debtor agreed to undertake the obligation to obtain the necessary documentation to allow the South Africans to work in the United States. The combined testimony of Botes, Coetzee, and Marias, as well as the interim activities of PJ Services in traveling to South Africa in the winter of 2000 and in soliciting qualified agricultural workers – combined with Hunt's letters to PJ Services counseling that the South African workers should be patient and that the Debtor had jobs available – convinces the Court that the Debtor and PJ Services reached an agreement whereby PJ Services was to supply the Debtor with at least 250 qualified South African candidates[10] by January 15, 2001.

---

[9] The presence of the other essential elements for a valid contract to exist are not contested by the Debtor. The Court notes that sufficient evidence exists to support a finding that the parties were competent, the subject matter was proper, legal consideration was present, and that the parties had mutuality of obligation.

[10] The Court does not find any need to discern whether the terms of the oral agreement included 600-700 South African candidates to be supplied for the remainder of the year because PJ Services is not making a claim for damages on those prospective candidates that it never acquired and that the Debtor had not yet requested. Although Botes testified that he provided the Debtor with 270-300 qualified applicants and that payment was due on the Debtor's approval of

The Court also finds that Botes and Coetzee's testimony that PJ Services was to receive $1,000.00 per worker is both reasonable and credible. Despite the inconsistencies noted by the Debtor regarding the terms of the contract, PJ Services consistently claimed that it was entitled to $1,000.00 for every worker that was accepted by the Debtor. Bolstering Botes's and Coetzee's credibility in this regard is the fact that they quit soliciting clients for their safari business to pursue PJ Services's contract with the Debtor full-time, and the fact that the Debtor referred independent South African candidates to PJ Services rather than taking those candidates directly. Considering that the Debtor stood to gain between $4,000.00 and $6,000.00 from its local cooperatives for the successful placement of each candidate, it seems logical that the Debtor would be willing to pay PJ Services $1,000.00 for finding, reviewing, and presenting qualified candidates to the Debtor's placement services for its use.[11] It is also reasonable to infer that Hunt and Rice were fired by Farmland for making what management considered an improper agreement involving payments to PJ Services.

In contrast to Botes's testimony that PJ Services was due $1,000.00 per applicant as soon as the Debtor issued its approval of that applicant, the Court finds that PJ Services was not entitled to payment until after the Debtor successfully placed a candidate at one of its local farm cooperatives. According to Rice, the Debtor was only paid by its local cooperatives in the event that a local cooperative employed an applicant furnished by PJ Services. At that point, the Debtor would issue an invoice to the cooperative for 20% of the candidate's first year base pay. Common sense dictates that the Debtor would not agree to pay PJ Services before being ensured that it would receive payment from the local cooperative. Botes himself recognized that PJ Services's fee was only a cut from what the Debtor's placement services department expected to receive from the local cooperative. Furthermore, the absence of any payment to PJ Services and the request by Hunt to defer payment until after the Debtor completed the paperwork necessary to legally hire the South African workers

---

those applicants, the testimony of Botes, Coetzee, and Marias was that the Debtor only wanted an initial 250 workers and it simply had not issued an order for any more.

[11] The fact that PJ Services also exacted a fee from the individual candidates does not detract from the Court's conclusion that the Debtor agreed to pay PJ Services $1,000.00 per applicant.

convinces the Court that PJ Services was not owed any money until a candidate was successfully placed in a local cooperative.

Accordingly, the Court finds that PJ Services demonstrated by a preponderance of the evidence that it reached an agreement with the Debtor to supply 250 South African workers by January 15, 2001, for which it was entitled to receive $1,000.00 for every worker it referred to the Debtor that was acceptable and that the Debtor successfully placed in a local cooperative. The Debtor was responsible for obtaining the necessary documentation to allow its local cooperatives to hire South African aliens. The Court also finds, as Botes testified, that PJ Services was obligated to find a qualified replacement candidate free of charge for any accepted worker that failed to complete a three-year employment term with the Debtor's farm cooperatives.

### B. The Statute of Frauds

PJ Services contends that its oral contract with the Debtor could be performed within one year; therefore, it does not fall within the Statute of Frauds.

Contracts that cannot be performed within one year are subject to the Statute of Frauds. Such contracts must be evidenced by a written memorandum. *Restatement (Second) Contracts* § 110(1)(e). If an oral contract falls within the Statute of Frauds, it is unenforceable against the party to be charged. § 138. Section 432.010 of the Missouri Revised Statutes specifically states that "[n]o action shall be brought ... upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized."

In this case, Botes admitted that PJ Services had obligations that extended beyond one year. Although Botes stated that PJ Services was to supply all of the South African workers during 2001, and that the individual workers – not PJ Services – had three-year employment terms, Botes also stated that PJ Services was obligated to find a qualified replacement worker free of charge if a previously chosen candidate failed to complete a three-year employment term. Accordingly, PJ Services had contingent obligations under the oral contract that could not be satisfied within one year and the oral contract falls within the Statute of Frauds. *See, e.g.*, *Martocci v. Greater New York Brewing Co.*, 92 N.E.2d 887, 889 (N.Y. 1950) ("Since, however, the terms of the contract are such that the relationship will continue beyond a year, it is within the statute, even though the continuing

liability to which defendant is subject is merely a contingent one. The endurance of defendant's liability is the deciding factor.").

**C. Exceptions to the Statue of Frauds**

PJ Services contends that even if the Statute of Frauds is applicable to its oral contract with the Debtor, the Statute of Frauds does not prevent enforcement of its contract because it has fully performed its contractual obligations.

Merely because an oral contract is within the Statute of Frauds does not mean that the parties are left without any rights under that contract. The most common exception to the Statute of Frauds is that when one party fully performs its obligation, the other party cannot excuse its own performance by operation of the Statute. *Bolman v. Chapman*, 666 S.W.2d 914, 922 (Mo. Ct. App. 1984) ("The Statute of Frauds does not apply if there has been full performance by one of the parties."). *See also Restatement (Second) Contracts* § 130(2) ("When one party to a contract has completed his performance, the one-year provision of the Statute does not prevent enforcement of the promises of other parties."); § 145 ("Where the promises in a contract have been fully performed by all parties, the Statute of Frauds does not affect the legal relations of the parties."). Generally, like full performance, substantial performance is also sufficient to remove an oral contract from the Statute of Frauds. *Croci v. City Bank & Trust Co.*, 431 F.2d 695, 695 (4th Cir. 1970).

In this case, PJ Services substantially, if not fully, performed the established terms of its oral agreement with the Debtor.[12] It provided – or was prepared to provide – the Debtor with 270-300 potential candidates – all but two of whom were approved by the Debtor – to fill the Debtor's order for 250 applicants that it intended to place with its local farm cooperatives throughout the United States. The only reason all the workers did not come to the United States was because the Debtor postponed their departure due to the delays it experienced in obtaining the necessary documentation to allow it to hire those candidates. In fact, the Debtor did match 10-12 workers with local cooperatives and interviewed about another 35 candidates before the INS raided PJ Services's office and the Debtor elected to discontinue its relationship with PJ Services. Accordingly, the Court finds that PJ Services substantially – if not fully – performed its obligation under the established oral

---

[12] The Court notes that PJ Services retained contingent obligations lasting for three years that were subject to conditions subsequent. Naturally, PJ Services's performance of the contingent obligations could not be satisfied as of January 15, 2001.

agreement and that its performance entitles it to enforce the Debtor's obligations under the contract notwithstanding the Statute of Frauds.

**D. Breach**

PJ Services performed its obligation to provide the Debtor with 250 qualified applicants by January 15, 2001. It was the Debtor – not PJ Services – that failed to perform its obligations under the contract. As evidenced by the numerous pieces of correspondence in evidence, as well as Botes's testimony, it is clear that the Debtor undertook the task of obtaining the necessary documentation to allow the South African candidates to work in the United States. It is also obvious that the Debtor failed to fulfill that obligation by the January 15, 2001 deadline. The Debtor was simply mistaken about the length of time necessary to complete the documentation, but under the oral contract, that was a risk that was assumed by the Debtor. *See, e.g.*, *Restatement (Second) Contracts* § 154(b) (stating that a party bears the risk of a mistake when that party "is aware, at the time the contract is made, that [it] has only limited knowledge with respect to the facts to which the mistake relates but treats [its] limited knowledge as sufficient").

The Court also finds – had the Debtor fulfilled its obligation to obtain all the necessary documentation to allow the South African candidates to work in the United States – that Debtor could have successfully placed all 250 candidates ordered on January 15, 2001 at its local cooperatives. Botes stated that the Debtor anticipated needing between 600 and 700 candidates over the course of 2001, and on May 21, 2001, Hunt wrote to PJ Services indicating that the Debtor still had 194 "open slots." Presumably, that number would increase and decrease as the Debtor filled those "slots." Accordingly, the Court finds that the Debtor breached its oral contract with PJ Services because it failed to timely fulfill its obligation to obtain the necessary documentation allowing the South African candidates to work in the United States.

**E. Indemnification**

PJ Services asserts that it is entitled to $4,250,000 in indemnification damages on the grounds that it has incurred liability to South African employment agencies and individuals based on its attempts to perform its contract with the Debtor.

Generally, "[i]ndemnity is a right which inures to one who discharges a duty owed by him, but which, as between himself and another, should have been discharged by the other." 41 Am. Jur. 2d *Indemnity* § 1 (2004). *See also Jurgensmeyer v. Boone Hospital Center*, 727 S.W.2d 441, 444 (Mo.

Ct. App. 1987) ("The theory of indemnity applies only where there is an identical duty owed by one and discharged by another."). Equitably, indemnity is used to avoid the unfairness of having one party be liable for a plaintiff's entire loss while allowing another responsible party to escape all liability. *St. Joseph v. Kaw Valley Tunneling, Inc.*, 660 S.W.2d 26, 30 (Mo. Ct. App. 1983). In the absence of an express contract of indemnification, a party is only entitled to assert a cause of action for implied indemnity after "the indemnitee has suffered actual loss through the payment of a judgment or settlement." 41 Am. Jur. 2d *Indemnity* § 45.

PJ Services's claim for indemnity is flawed for several reasons. As discussed *supra*, PJ Services's contract with the Debtor provided that PJ Services was only to receive payment after the Debtor successfully placed a South African candidate with one of its local cooperatives. The evidence presented is not sufficient to show that the Debtor made any promises of employment to the South African candidates themselves. Despite the fact that the Debtor submitted H-2A and H-2B visa applications listing itself as the sole employer of "unnamed" South African aliens, Bell's letter to the United States Department of Labor on October 18, 2000, made it clear that the Debtor was only attempting to file one master application for employment certification rather than filing separate applications in the name of each Farmland cooperative that could potentially employ alien workers. Similarly, none of the submitted correspondence from Hunt to Botes, which Botes forwarded to South Africa, states that the Debtor promised jobs to the South African workers; rather, the Debtor only counseled that *PJ Services's candidates* should be patient while the Debtor completed the necessary paperwork and that the Debtor was confident that jobs would still be available for the South African workers. Furthermore, despite what PJ Services may have told Nienaber Consultants, Euro Personnel, or individual South Africans, the Debtor was not obligated to hire any applicant based solely on its acceptance of a resume. Rice testified that he told the South African applicants that came to the United States that the Debtor would attempt to place them at a local cooperative but that if the position was not available then they should contact PJ Services about finding alternative employment. In fact, after accepting a resume from PJ Services, the Debtor conducted an additional interview of the prospective worker after that worker came to the United States and then tried to find a match between the worker's skills and a particular need of one of its local cooperatives. The local cooperative then conducted an interview and decided whether to make an offer of employment to a candidate. While the Debtor may have ordered 250 workers from PJ Services by January 15, 2001,

the Debtor's obligation under that contract was to attempt – in good faith – to find jobs for those individuals at a local cooperative knowing that the local cooperatives were facing a shortage of qualified workers. By no means was employment guaranteed by the Debtor's acceptance of a resume. Based on these findings, PJ Services has failed to establish that the Debtor made any promises or has any liability to the potential South African plaintiffs.

Likewise, PJ Services's claim for indemnity also fails because it has not shown that it has paid a judgment or a settlement to any of the potential South African plaintiffs – much less that it is liable on those potential claims.

**F. Damages**

PJ Services's claim for damages includes $250,000.00 owed based on the Debtor's breach of an oral contract, $1,330.00 for housing South African workers in a motel in Salina, Kansas, and $4,250,000 in indemnity for PJ Services's potential liability on South African lawsuits.

PJ Services is entitled to $250,000.00 based on the Debtor's breach of the parties' oral contract. As explained *supra*, PJ Services fully performed its obligations under the oral agreement by providing the Debtor with 270-300 qualified applicants to fill the Debtor's order of 250 applicants by January 15, 2001. The Court further finds that the Debtor's local cooperatives were experiencing a shortage of qualified laborers, and had the Debtor acted in good faith and completed its contractual obligations then it could have matched at least 250 South African workers with jobs at local cooperatives.

PJ Services is not entitled to $1,330.00 in expenses it incurred housing South African workers who came to the United States and were interviewed by the Debtor. PJ Services failed to establish that the Debtor was responsible for feeding and sheltering those candidates before they had accepted an offer of employment from a local cooperative.

As explained *supra*, PJ Services is not entitled to any recovery based on indemnity.

### III. CONCLUSION

At trial, PJ Services established by a preponderance of the evidence that it confected an oral agreement with the Debtor whereby it would supply the Debtor with enough qualified South African workers to fill up to 250 positions at the Debtor's local farm cooperatives by January 15, 2001. In return for its performance, the Debtor promised to pay PJ Services $1,000.00 for every candidate that

it referred to the Debtor that was hired by a local cooperative. The Debtor undertook the obligation of filing the necessary documentation to legally hire the South African aliens in the United States, and PJ Services promised to replace any worker – free of charge – who failed to complete a three-year employment term. Although the oral contract could not be performed within one year due to PJ Services's continuing contingent obligations, PJ Services substantially – if not fully – performed its part of the contract and is entitled to enforce the Debtor's return performance notwithstanding the Statute of Frauds. Because the Court finds that the Debtor could have placed all 250 workers that PJ Services referred to the Debtor, the Court finds that PJ Services is entitled to breach of contract damages in the requested amount of $250,000.00.

PJ Services is not entitled to any indemnification because it failed to establish that it, much less the Debtor, was liable on the demand letters it received from Nienaber Consultants and Euro Personnel. Likewise, PJ Services is not entitled to recover expenses associated with housing and sheltering South African candidates because it failed to establish that the Debtor was liable for those expenses under the terms of its oral contract.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 28th day of September 2004.

                                                    /s/   Jerry W. Venters
                                          United States Bankruptcy Judge

A copy of the foregoing mailed electronically or
conventionally to:
Tammee E. McVey
Michael Small
Kori Crouse